and the Round Lake Area Park District. On behalf of the Avalon, Mr. Michael Reagan. On behalf of the Athlete, Mr. Edward F. Duck. Good morning, Council. Mr. Reagan. Thank you, Your Honor. My name is Mike Reagan, and together with Tim Whiting, who is sitting at the Council table with me this morning, I represent the plaintiff, Kevin Kramer. This case is before the court on the grant of motions to dismiss, and not from a jury verdict, and not even from the grant of a motion for certain judgment. The grant of the motions to dismiss of this case at the outset denied the plaintiff the right to develop the factual issues and to give context and richness, if you will, to the factual questions which I intend to talk about with you this morning. There is a minor question here as to whether the defendant is entitled to an absolute immunity or to a qualified immunity. Now, the qualified immunity would be where there is an exception for welfare-involved misconduct, or in the case of negligence, where there is a specific variety of negligence which is permitted to be maintained. But in reality, we are dealing with the scope and meaning and applicability of the availability of a qualified immunity here. Murray v. Chicago Youth Center is only one of now many Supreme Court cases which hold that where there is a specific immunity provision, it is to take preference over more general, nonspecific immunity provisions. And the defendant here primarily contends that its immunity is to be found under Section 3-106, which deals with the use of public property for recreational purposes, 3-106. And 3-106, which is contended for by the defendant here, does contain an exception for welfare-involved misconduct. The plaintiff contends that Section 3-109 applies, which is dealing with hazardous recreational activities, and we'll obviously have to talk about what that means here in just a second. Well, maybe if we could turn to that for just a second actually. And the two exceptions that are talked about or mentioned in 3-109, the first being where a public entity had notice and the participants didn't have notice and therefore the public entity would have had an obligation to warn. Here, under the facts of this case, if the Park District should have known that the boards or boarding was dangerous because players who were playing the game knew that it was general knowledge that they would run into each other, into these boards and the walls, wouldn't the plaintiff have had notice also and therefore? And the court's question is very specific, dealing only with the first. Just the first. Just the first. I mean, I have another question with regard to the second as well. But that's the first. It's a very specific and highly appropriate question. And there is a difference in level of sophistication here. We're dealing with a 22-year-old playing a game versus the Park District and its requirement that it be knowledgeable in terms of the maintenance of its property. Secondly, the distraction exception, which applies in common law, may also have application here. And one of the nuances which doesn't appear, and again, we're all hampered in a way with the facts here because this was done on a motion to dismiss, but there are photographs in the defendant's brief of the sideline. But the sideline, this happened in the end zone. And it tapers. I mean, you can tell poorly from the photographs, but the sideline comes down and then narrows to 14 inches at the end of the field. And so really we're dealing with should this 22-year-old have had full knowledge, sufficient to support a motion to dismiss, that he cannot take advantage of Section 1, which you're talking about here, that this thing's tapering down and that this type of injury can result from that. Counsel, was that measurement in the record, that 14 inches that you talked about? The measurement is not in the record, Your Honor. And I look for it there, and it's not there. The photograph is, the photograph does show poorly the tapering effect when you get to the end. Mr. Reagan, you said there are different levels of sophistication, and I would like to think that that's true. However, there's a minimum level of sophistication, and there are certain dangers that are open and obvious and notorious, self-explanatory. Why wouldn't these barriers, these boards be deemed by a 12-year-old to be dangerous as opposed to a 22-year-old? And that is certainly an issue, again, dealing with Section 1 here. You, in response to Presiding Justice Zenos' question, responded with, there are different levels of sophistication. And my point to you is, there are, but there is, in this instance, some question as to whether or not the level of sophistication of a 22-year-old and that of an employee or supervisor of a park district would have differing levels of sophistication relative to whether someone who runs into those boards would otherwise be affected than he was. And so, what I'm asking you is, you don't have to concede the point, but I would at least like to hear why you think that there's a different level of sophistication which would sustain your cause of action as opposed to a different level of sophistication. However, this fact or circumstance is such that it would fall within either level of sophistication. And the answer is the degree of the risk of injury, if you will, that a 22-year-old does not appreciate that with running into a wall, if you will, that the risk exists that he breaks his neck and has the terrific injuries that he has here. Well, do you think you'd have to inspect or understand that there'd be a specific injury involved rather than just harm in general, and that you could break a leg, you could break or split your skull, you can injure your spine? Part of the analysis of whether a duty is recognized under the law has to do with the risk, the nature of the risk and the consequences of what happens to a plaintiff and also the burden of placing the duty on the defendant and things like that. And part of that general analysis of formation of duty is the risk involved. And the risk here is in part measured by the nature of the injury which can occur. You also mentioned distraction. Is it that all forms of distraction are deemed capable of sustaining a cause of action, or are only foreseeable distractions capable of sustaining a cause of action? Well, I think there's something more utterly unforeseeable than it would probably not be. What I'm getting at, for want of a better layman's terminology, was this distraction something that would be deemed to be a normal distraction in a game of flag football? Well, with respect to foreseeability, it is of no different level of foreseeability, one way or the other, either in terms of the defendant or in terms of the plaintiff. Then the post was in ward, the fellow walking with a mirror in front of him that he can see behind him, but he can't see the post, or in divert, where he walks into a rut on a construction zone. So both of those were to be known. And to say that, well, this is just so ordinary that you'd have to anticipate that, then really guts ward and guts diver, because you have to say, with all due respect, I'm sorry, the same thing about both of those things, that anybody can see a post and you shouldn't walk into it. Anybody can see a rut and you shouldn't walk into it. And we're dealing here with somebody who has been invited, permitted, encouraged to play this game, and it's this game. It's flag football on a soccer field with the dimensions, which are on record, of 40 yards by only 25 yards wide. And with the knowledge, then, of how football is played, it is certainly foreseeable that somebody is going to be intent on the play, intent on knocking down a pass, and then running into, in this case, a wall, but if it had been a post, a post or a rut. What was the claim of distraction? He was going after a ball? Yes. How is that a distraction to the extent that if you're playing the game and you're attempting to either block the pass or catch the pass, how is that a distraction? That sounds like it was an intentional, volitional act. Running into it. Done out of ignorance. I mean, it's like someone who goes through a stop sign. Did they intend to go through the stop sign? Well, he didn't intend to run into the wall, and the guy in Divert didn't intend to run into the post, and the guy in Ward didn't intend to run into the post. In Divert, he didn't intend to walk into the wall. Some people don't intend to go through stop signs. In Ward, Ward had control of how the layout was, where the post was. In this case, the Park District has no control over how the ball is thrown. Well, that part's true, but the analysis of fault goes back earlier than that, which is when the decision is made to permit this variety of game, and we can't just simply call it flag football. I mean, you have to look at the facts, and we're short of facts because of the truncation of the litigation here. And so while it's true that they didn't have control over how the ball was thrown, they had control over the decision to say, okay, we're going to permit people to play football on this field with the configuration of the end zone as shown in the photograph and the record. And that's where the negligence lies, not at the moment that the pass was thrown. Counsel, if we look at the second exception for a minute, whether or not the conduct was willful by the public entity and whether that was the proximate cause, isn't it a fact here in this case that the Park District had taken some measures to keep the game within the playing field, within the lines, by including a rule that in order to receive the ball, players had to have one foot inbounds, and therefore doesn't that show there wasn't any utter indifference? What it shows is a question of fact. What it shows is the type of evidence that should be evaluated by the court, either on a motion for summary judgment or at the time of trial. So, yes, the defendant surely can and would point to that as a force in its, as a fact in its favor. We, however, would point to testimony that it is impossible under the dimensions of the field to comply with all that and to produce expert testimony as to whether or not the risk here was something that should never have been permitted to exist. Do you agree that to get involved in the second point, willful and wanton, must be shown utter indifference or conscious disregard by the Park District relative to the elements raised? I agree. Padding, safety equipment, size of field, I think those are the three main elements you raised. Yes, but it's very, very important. I mean, if in the time that's left, I mean, I think it's… You can allow it. No. Okay. Okay, thank you. Murray puts an end to a lot of the debate in this area. And with all due respect to my true friends at the other table here, in their brief in discussing, Justice Baldwin, the exact question you've asked, what is willful and wanton misconduct, they never cited Murray. They never mentioned it. And what they cited was a long list of cases which grind away on the now discredited principle that there is a different definition of willful and wanton misconduct for tort immunity purposes than there is under common law. And Murray categorically held that the definitions are exactly the same. And so the cases which talk about that there has to be a conscious course of action or perhaps close to what you're asking about, there are cases which say that, well, a safety device has to have been removed. Well, I think the definition of willful and wanton includes the language I'm talking about. It does. But Burke versus 12 Rothschilds and then Ziarko and then Poole and then leading up to Murray talked about the fact that there is this wide continuum of willful and wanton misconduct. And so at one end, it does shock the conscience. And they tell you that it must shock the conscience. And that's not true. It is only at the nearly intentional end that it does. But at the nearly negligent end, it need only be a failure to take preventive measures once the risk is identified or once it is identified or should be identified through reasonable care. And in our reply brief, that's set out in some depth. How is that different from negligence though? It is close to negligence but not. There is a quantum break. Negligence doesn't seamlessly segue into willful and wanton. But Schneiderman versus international transport is the classic formulation which Murray permitted. And it talks about a failure after knowledge of impending danger to exercise ordinary care or failure to discover the danger through recklessness or carelessness when it could have been discovered or a reckless disregard for the safety of others. And we have the right to raise that as a factual question as to whether or not this constitutes willful and wanton misconduct. You gave three criteria in that definition. The first sounded to me like it was negligence. The second and the third sound like reckless disregard. And so to me, you're comparing tangerines and oranges. They're not quite exactly the same. But they are. I didn't mean to cut you off. No, you didn't. Okay, I realize if I did, did you? I would have bled. Okay. Let me point this out. The Tort Immunity Act defines willful and wanton as the course of action that shows actual or deliberate intention. And we all agree that there's no actual or deliberate intention, correct, to harm. If not intentional, it shows an utter indifference to or conscious disregard for the safety of others or their property. Do you agree that that's the proper standard to use in defining willful and wanton? I do. And then you get into Murray. And how does Murray help your case? Murray talks about, I think the important part of Murray is that it includes conduct by omission. Yes. And is that the point you're making in relying on Murray? Most of the cases that are cited by the defendant here talk about things which are no longer proper to consider after Murray. And what Murray did was to make a mid-course correction because there were some cases, a number of them, which looked at the definition and said, Okay, now you must have a course of action. Okay, omission is not good enough. You have to have a course of action. You have to have a conscious decision to do something. And none of those things survive Murray because Murray recognized that the definition has always been the same for common law and tort immunity purposes. And that, in fact, the definition of willful and wanton misconduct in the Tort Immunity Act is verbatim the definition from the very first green volume of IPI defining it for common law purposes. And so the cases which held plaintiffs in tort immunity cases to a very high, strict level of care, you know, being able to prove willful and wanton, simply don't survive anymore. Murray still requires willful and wanton, but it makes clear that there is a wide range for question of fact to operate here. And we suggest that it was reckless to make the decision to permit football to be played on this field. Now, the trial judge talked about other sports. He said, well, aren't there walls at some point in every building? I'm sure Mr. Dutton is going to tell you that when he gets up here. Don't baseball players run into walls? Don't basketball players run into walls? Exactly. But those things are all specific to the sport. Here we have something unique. Here we have an inappropriate use of property. We have the decision made to permit football to be played on a soccer field. And there was an international incident recently where somebody used their hands at an international soccer match, and the world went nuts because the focus is different. And so the focus in football is going to be many times looking up in the air, looking to use your hands, et cetera. And so that's the distinguishing feature there. But what I've sort of morphed into here is the need to be making a final argument to the three of you as to whether this is willful and wanton misconduct, when in reality we've been deprived of the opportunity to develop expert testimony, to come in with more facts. And then if that's to be tested with a motion for summary judgment. How can you label a willful or conscious disregard, conscious indifference, when they had rules, the rules provided specifically when you could butt, when you could use your hands. The rules provided specifically how close you could get to the perimeter of the field before you could catch a ball. And how does that comport with saying you had just consciously disregarded everything? Because the rules can't make something safe which is unsafe. And therefore, with an end zone of whatever dimension the facts of the records may ultimately show it to be, but which the photographs show to be, small. If the rule says one thing, but nonetheless if it can't be complied with, if in simply people, adults, moving around a field, you're going to be carried out of the field and into the wall, then I respectfully suggest that the formulation of the rule doesn't solve the problem. And certainly if it were my child who was out there and the decision was made to permit this game to be played there, it would be offensive. So. Counsel, you'll have additional time on rebuttal.  Thank you. Mr. Dutton. Thank you. Your Honor, if you'll please the court. My name is Ed Dutton. I represent the Park District of the FLE. I'm here with Catherine James. She's my co-counsel. Cathy and I have worked together for years. Let me begin by thanking you for the opportunity for oral argument. I truly appreciate it. Not every case gets orally argued. I'm very well aware of that and I appreciate your time here today. I'm going to take my notes and I'm going to set them aside. The reason why, I came here with a set argument that I was going to make. But after listening to Plaintiff's counsel's argument and the court's discussion with them, I'm actually going to start a reverse order if that's okay with you. So setting these notes aside. The first issue I want to address, Plaintiff's counsel comes out of the box and says, the problem with this case is we didn't have sufficient time at the trial court level to be able to develop the facts, and I think you used the term, give context and richness without the benefit of discovery. Let's start with that, please, because I drafted that as the last portion of the brief. Didn't the record reflect that counsel was given an opportunity to either have his complaint stricken or 304A, and he picked 304A? Yes, Your Honor, and that actually goes to the issue of whether Plaintiff had an opportunity to amend or not. He was given that opportunity and instead took the appeal. I'm talking separately even about the discovery issue itself because Plaintiff argues both here and in the brief, well, wait a minute, this case shouldn't be before the court because this was on a motion to dismiss and we didn't have an opportunity for discovery. And I'm going to touch on that for a couple of minutes. Because if Plaintiff's argument were correct and were adopted by this court that we have to go through either a summary judgment or a trial, much of the tort immunity act would no longer be effective. That's one part of it. I don't know that he's saying that. I think what he's saying is that he wanted discovery before 2615 was dismissed. He says that as well. And so now you've taken that one step further and suggested that he's now saying he's entitled to a summary judgment hearing or trial. Why don't we just address what I think you were going to say, at least I thought I was following up, which was should there be discovery in cases like this before a 2615 motion is heard? I'm going directly there, Your Honor. Okay. And there should not be. And I've cited Storm v. Sisolich, which also dealt with a combined motion to dismiss 2615 and 2619. And the court correctly says what is basic black-letter law that we all learned in law school? Until you state a viable claim, you don't get to do the next part of the lawsuit until you survive the motion to dismiss. Where otherwise 2615 would be written out of existence. There would be no reason for it. Why would there be the opportunity to move to dismiss if the plaintiff in every instance said, don't move to 2615, wait until summary judgment or trial because I get a chance for discovery first. With regard to the separate issue on 2619, the Supreme Court has supplied rules. This court knows better than I do. Rule 191A and B provide two separate provisions. One is for the plaintiff to respond to a 2619 motion. The plaintiff can file affidavits that conform with 191A. That was not done here. The second opportunity to respond on a 2619 is with a 191B affidavit where the plaintiff says, before I can respond to this 2619 motion, I need X, Y, and Z specifically from, in this case, the Park District. That also was not done here. So that's why I want to begin right off the bat by talking about the issue of discovery. It doesn't come up here. That was the reason why. Did the court consider any affidavits in its determination of the motion? Because, as Justice Senoff indicated, there appears in records some affidavits filed by members of the various football teams that they were aware that there were walls and people get injured. Yes, there were three affidavits. They were identical, Your Honor, yes. But there were three affidavits filed. Were they considered when the 2615 motion was argued? I don't know if they were considered when the 2615 motion was argued. And the reason I answer it that way, I'm not trying to be kinky in any way. I don't know because the trial court didn't reference them in ruling on the 2615. What I do know is I objected to them because they were submitted in response to both the 2615 and the 2619. The plaintiff also submitted photographs in response to the 2615. And I objected and said, Your Honor, we're here on the same hearing, and I believe they were all part of the mix. But whether the trial court specifically looked at those affidavits in ruling on the 2615, I'm not exactly sure, Your Honor. But going back to the discovery issue, I don't think that plays here. The second issue the plaintiff raised is that Murray somehow represents a sea change in Wilkelin-Martin misconduct case law. And I disagree for several reasons. And I'll talk about why Murray doesn't apply here, although there's parts of it that actually are useful to me, and I'll talk about those. But one of the main reasons is because Murray was dealing with, as I point out in the brief, a 1992 occurrence. And at that point in time, the Tort Immunity Act had two absolute immunity provisions that were applicable in Murray. One was 3108, supervisory immunity, and the other was 2201, discretionary immunity. That changed in 1998. In response to the case of Barnett, the legislature amended two provisions of the Tort Immunity Act. One was 3108, and the legislature adopted a Wilkelin-Martin exception. Now it reads much like 3106, for example. And at the same time, the legislature amended 1210 and tacked a sentence onto the end of it. And that sentence said, in any case dealing with a Tort Immunity Act provision, the definition that shall apply, not may apply or will apply, but shall apply, is the 1-210 definition. And the Supreme Court specifically in Murray said, and I'm quoting it, I'll try to find the site here, 193 of the Northeast. Find my spot here, give me just a moment, please. Accordingly, we express no opinion on the effect, if any, of the 1998 amendment on Wilkelin-Martin liability covered by the Tort Immunity Act. That's significant, as I pointed out in my brief, because in Murray, the Supreme Court said, back in 1992, we had both statutory and common law definition. And Plaintiff's Counsel mentioned some of the common law cases, the Poole case, for example, or the Ziarko case. Both of those are non-Tort Immunity Act cases that involve the common law definition. You can find plenty of cases out there from that period of time earlier that use the word reckless. If you read the Tort Immunity Act definition, you will not find the word reckless anywhere in there. Since then, two things have happened. One, the legislature acted in 1998 to amend 1-210 to say, this is the definition we need in the statutory definition. I actually cited a case called Lowe v. Provena, where one of the appellate, one of the divisions of the appellate court, the third district, actually looked at a statutory definition of Wilkelin-Martin and said, because there's a statutory definition, this is the one that applies. That's the same reasoning that's here. The second thing that happened, aside from the amendment in 1998 to Section 1-210, is that the jury instruction was modified to reflect the Tort Immunity Act definition. Now they read almost word for word together. But you won't find the word reckless in that either. So actually, the argument is the reverse of what Plaintiff's Counsel is making. All of that case law from many, many years ago that used the phrase reckless doesn't apply, because the legislature said that was the very point of adopting the additional language. It wasn't a coincidence that they were both passed and adopted by the legislature on December 5th of 1998. That was not by coincidence. The Wilkelin-Martin exception to 3-108, the same day the legislature says, and this is the definition that shall apply. Murray was not a seat change. More broadly, though, we're talking about Murray, and I spend my entire brief, it's probably rare for the court to have two briefs that just pass in the night. But I talk in my brief very little about Murray, except for the fact that if you want to talk about what Wilkelin-Martin requires, Murray's a textbook example. Let me point out, your time is limited, and your opponent spent a little time on Section 3-109. So if you could sort of mention that along with your argument. That's exactly where I'm going, Your Honor. The reason why I spent very little time talking about Murray, because Murray is a 3-109 case. 3-109 has no application here for several reasons. One of those reasons is that, as the Supreme Court recognized in Murray, that involved trampolining. Trampolining is specifically listed in 3-109 as a hazardous recreational activity. You won't find flag football in it. Body contact is, and I think you'll admit that body contact is involved in flag football. Body contact is involved in flag football? Absolutely correct. Body contact is involved in doubles tennis. The key distinction, though, is 3-109 uses the phrase rough bodily contact. And that is where we break off. Because rough bodily contact is, I believe, ice hockey would involve rough bodily contact. I believe full contact football with pads would involve rough bodily contact. I don't believe flag football would, for the very reason, among others, that the Park District actually had rules that prohibited or avoided bodily contact. We can talk about, I mean, they changed the general rules of football, Your Honor. Well, let's address the rough bodily contact. Did this occurrence arise out of rough bodily contact? No, actually it did not, Your Honor. This occurrence arose out of a collision with the wall. So then the question becomes, if there's rough bodily contact, does it then mean that that would open up other areas or other cans of fish bait and come up with, now they have to have, if they're going to wear spikes, they have to have special carpeting or whatever to keep them from slipping on slippery floors. What I'm getting at is, is the terminology supposed to relate to the contact or the apparatus, or is it supposed to relate to anything that is involved indirectly or directly to that form of recreation? I.e., if you use a trampoline and you slip and fall on ice outside, is now the Court of Amendment Act applicable to the slip and fall? Because this was a trampoline. That would be the problem with a broader definition. I believe that if you read 3109 to me, any time and any activity where there'd be the possibility of rough bodily contact, including trampolines is mentioned separately, so let's take that. But let's use doubles tennis. Is there going to be the opportunity for rough bodily contact? Yes, I have seen doubles tennis players absolutely smash into each other. It can happen. Does that automatically put it into 3109? Well, then the exceptions rather, as well as the rule as far as I can read it. I believe actually it means, by that definition, sports in which rough bodily contact is an intentional part of the game. I come back to ice hockey. I would have no dispute with ice hockey being a sport of rough bodily contact. But when I get away from ice hockey and I start talking about sports where bodily contact, especially rough bodily contact, is not the goal of the game but is rather incidental to it, I would have a more difficult time expanding 3109 because otherwise we'd have the problem you're mentioning, Your Honor, and that is the exception begins to swallow the rule. Well, would you concede that there is bodily contact? Absolutely, Your Honor. There is bodily contact in all manner of recreational activities. Is that a question of fact as to whether or not it's rough? Never. And the reason why is it's a matter of statutory interpretation, and that is never going to be a question of fact. It is, is this what the legislature met the courts? Well, isn't this a mixed question of law? Whether the facts that exist apply to the particular section of the statute? I don't believe so because I'm not aware of it. Or whether the statute applies to the particular set of facts. I don't believe so. I'm not aware of a disputed issue of fact in the record, Your Honor. I am aware of two different interpretations of 3109, one of which is mine, that it has no application here whatsoever for the very reasons the Supreme Court sets out in Murray. Trampolining in Murray was listed as a hazardous recreational activity. Here it's not. And when we look at the statute itself, it talks in terms of rough bodily contact for other types of activities that fall within the scope of 3109. And for the reasons I've set forth, it's a matter of statutory interpretation. Just because you could have incidental bodily contact in all manner of recreational activities doesn't automatically walk that into 3109. But let me take a step back from that for a moment. As I mentioned in my brief, Plaintiff spends a whole, actually his entire brief talking about 3109 and the reason why that applies here. But at the end of the day, 3109 would only affect the application of 2-201 discretionary immunity, which is absolute. But whether this court were to apply 3109, which doesn't apply here for the reasons I've set out, or 3106, recreational property immunity, which is directly on point, it's still the same underlying standard. As the Supreme Court confirmed in Murray, the standard under 3109 is willful and wanton conduct, just like the standard under 3106 is. So at the end of the day, it wouldn't matter because then we're back to the initial part of the brief, and that is the Plaintiff hasn't pleaded sufficient facts to state a cause of actual willful and wanton conduct. Whether it was analyzed under 3109 or 3106, we end up at the same place. I've touched on the fact in my brief that no case has ever held that 3109 somehow trumps 3106, which I believe was the Plaintiff's argument here today. I come back to not only is there no case law that holds that, but it wouldn't make logical sense or match up with the language of the statute. Well, you used the term trump, and I don't play off cards to understand what you meant by that. I take that word from some of the case law, which talks about different provisions of the Tort Immunity Act either trumping or serving as exceptions to other provisions of the Tort Immunity Act. Well, isn't the difference between the two what you said, rough bodily versus regular bodily, or recreational facility? Yes. Isn't the argument really the 109 is more specific than the others? That is one argument, yes. That is one argument. Again, I come back to— And isn't that the primary argument? It may be the Plaintiff's primary argument, although I come back to I don't think we need to resolve whether 3109 or 3106 is a so-called more specific one. I don't think there's any way to do that. Second, 3109 doesn't apply here for the reasons I've set out. Touch football, flag football is not listed in it, and by definition and by the rules the Park District adopted for this sport, it is not a sport of rough bodily contact. But again, whether it's analyzed under 3106 or 3109, we come down to the same basic issue. Is this sufficient for Wolfram I? And for all of the reasons I've laid out, and I must have cited 15 cases, many from this court, we have a non-defective wall, it's not hidden from view, and the plaintiff simply runs into it. And I go back to the start of my argument. If that's enough to create a question of fact on Wolfram I, the world's not going to end, but there will be a lot of recreational activities that will end because, as the court pointed out, hockey, the boards are actually part of the field of play. It's also true in handball, racquetball, and a host of activities. And if merely running into a wall creates a question of fact on Wolfram I and Condon, many of those activities will no longer be played, and that actually will frustrate the purpose of the Tort Immunity Act, which was adopted by the legislature in 1965 and broadly amended in 1986 specifically to protect public entities from the risks of providing recreational activities. Thank you for your time. I appreciate it. Thank you, counsel. Mr. Reagan. There is nothing to the argument that there was some mysterious amendment made in 1998 which the Supreme Court in Murray didn't decide and which still has some sort of viability to help from here. Immediately above the part in Murray which Mr. Dutton just read to you where the court said we think it inappropriate for this court to consider the 1998 amendment, which was simply good judgment because it didn't apply to the case, the court said that the 1998 amendment to Section 1210 added the following language and says this definition shall apply in any case where Wolfram I exception is invoked in the act. And so it is immaterial and there is no argument made here that the definition is any different, and that is truly a red herring. Secondly, on the question of 2615, 2619, the trial court treated them at the same time and as a part and didn't distinguish between them and simply granted them both. And the 615 here, because Mrs. McLaren touched upon it real well, you get discovery of all cases before you can hear the 615, and the answer is no, not in all cases. And the 615 motion, again, as Mr. Dutton is trying to put it, is to turn back history here, and so he italicizes that Wolfram I misconduct must involve a course of action and you can't simply have mere inaction, et cetera. That was what the 615 motion was all about. And then you get into the 619 motion, which is where they were trying to bring in the guts of the immunities, and you can't use a 619 motion to try a case. Obviously, the court gets to consider some facts, but the comments to it say you can't try. There's a disputed question. You can only look at narrow things, but you can't go into the whole thing here. On the question of the amendment, there's no doubt what the trial court's mind was. At R85, at the end of the argument, the court said, Mr. Whiting talked about a 304A. The court said, I think that is appropriate. I think, based upon my finding, I don't think that you could plead an action in this matter. I think that they are immune. So, I mean, this was a question of the court. It wasn't focused on any particular lack in the pleadings, but he simply said they are immune. Now, at the risk of bringing some levity into what is really a very serious situation here, I just want to emphasize, if I may, that the unique facts of the case have to be considered. We can't just say flag football or football or this. You have to say, okay, what happened here with this activity? So it's this game, these rules, this day, this field, this decision to play football on a postage stamp-sized field with highly dangerous, inappropriate boundaries. And so the levity part, I was thinking, well, what about Quidditch, the game that was played in the Harry Potter books? I mean, it was made up for the books, and yet you simply can't say, well, the subject of immunity is a hazardous recreational activity or not. You have to look at the facts. And the growth of the facts was stunted here because of the premature and early grant of this motion. Briefly on 3109 and its applicability, there was already a healthy debate up here about whether this was a rough bodily contact, et cetera. But also there is the prior part of 3109 which talks about a general definition. If the Court will just bear with me for a second, this is the last thing I intend to talk about. The general definition of a hazardous recreational activity means an activity, quote, which creates a substantial, parentheses, as distinguished from a minor, trivial, or insignificant risk of injury to a participant. And so the legislature has given this Court two forms of guidance as to what is an activity which creates a substantial risk of injury. So we're not left to simply go figure out what substantial means because what it means is something which is not minor, trivial, or insignificant. And so if the risk here is not minor, trivial, or insignificant, then it is substantial within the meaning of the legislature, within the meaning of the statute. Secondly, when the Court lists the specific activities, and Mr. Dutton, both here today before you and in his brief, said that, well, it's important to know in Murray the trampolining was specifically listed. Well, that just made Murray easy, but it wasn't part of the rationale of the Murray Court in deriving its holding. But the specific activities which the, and I'll, if I can do this in one long sentence. It's okay, go ahead. The specific activities that are listed by the legislature as being hazardous recreational activities, many of them are very benign and certainly more benign than what went on here. And among those, and I've simply picked some, would be off-trail bicycling, cross-country skiing, sledding, kayaking, and windsurfing. And you'd have to look at all of those as being less dangerous than playing football, and certainly playing football in this environment. So it, you know, in fulfilling this Court's responsibility to figure out what did the legislature mean in its use of the words, then I think that the definition is substantial as being only that which is not minor, trivial, or insignificant. And also looking at these other activities suggests that flag football in this environment was indeed a hazardous recreational activity. I have a question. I don't know that I, I don't recall you saying whether something is specific vis-a-vis general as relates to sections. Do you have a position that something is more specific than a general proposition? Such as hazardous versus non-hazardous recreational activities, so this applies as opposed to that? If I understand the Court's question, yes, 3109 is the more specific here because the types of injuries listed there meet, encompass what went on here. But if you were to disagree with me, then we would take Mr. Dutton's position as a fallback, which is 3-106 applies, because it deals simply with recreational property, and it is specific to recreational property, and clearly, not recreational property, recreational activities. And that's what was done here, and there is still a possibility of willful and wanton misconduct there. So I would ask that the summary judgment be, excuse me, that the motion to dismiss be reversed. This matter be remanded for discovery and further proceedings. Thank you. Thank you, counsel. At this time, the Court will take the matter under advisory.